First case is Michael A. Newdow v. Peter Lefevre. Mr. Newdow. Thank you, Your Honor. May it please the Court, if possible, I'd like to reserve about six minutes for rebuttal. Yes. Could you move that microphone somewhat closer to you? Sure. Is this better? Try to keep track of your own time. I'll try also. Okay. Good morning, and if it please the Court, I'm an atheist. I don't believe in God. I actually deny God's existence, and I think that I'd like to have the same respect for my view that God doesn't exist that people have for their view that God does exist. That's what this case is about, simply respecting equally the divergent religious views. I have a church. It's the first atheist church of true science, and I know when I say that people scoff, what are you talking about? How can you have a church that doesn't believe in God? That's exactly the point, that you shouldn't scoff at that. That's a real idea. I would like to do with my fellow atheists what other people get to do with their fellow religious brethren. I'd like to join together. We have rituals. We have songs. We meet every new moon. And I'd like to be able to do especially what other churches do, which I kind of envy. They are able to help other people, and as Christians, as Jews, as whatever, I would like to be able to do that as atheists, and we can't. And I'd like to change that. And that's what this case, again, is about. What do I want? I want to be treated equally. And the question I would have you ask is, what do they want? They want to have their religious view espoused by the government. And if I understand the Establishment Clause, that's exactly what it exists to prevent. They shouldn't be able to do that. The Supreme Court has told you repeatedly, the last time was in McCreary County, that the touchstone for our Establishment Clause jurisprudence, the touchstone for the analysis, is the principle that the First Amendment mandates neutrality between religion and religion and between religion and non-religion. All I'm asking is to follow what the Supreme Court has said. In Appendix C to the opening brief, you have a listing of 30 separate majority opinions of the Supreme Court saying the same thing. And the lower federal court cannot responsibly decline to follow the distinct and explicit rules of the Supreme Court that was stated in this circuit under Underwood, right? You've had that. They keep telling you you have to treat people neutrally. You cannot possibly say that as between the belief that God exists and the belief that God doesn't exist, we're treating them neutrally when our national motto is in God we trust. That's totally inconsistent. Mr. Dudow, wasn't the purpose of the Establishment Clause not to establish a church, but rather there should be a separation of church and state, not religion and state? Was it not the purpose not to establish a particular religion as the church of our nation, as opposed to saying that, as you said, that God is removed from every reference in the Constitution or in our pledge? Well, I think the Supreme Court has answered that when it says it wants neutrality between religion and non-religion. It's talking about belief in God and non-belief in God. And I think what we have to do is separate, first of all, the words are respecting an establishment of religion. When James Madison first introduced it, he introduced it as any religion, any federal religion, any national religion. And that was expanded, right? They made the words very broad, no law respecting an establishment of religion. James Madison vetoed the father of our Constitution in 1811, vetoed a bill which just would incorporate a church in the District of Columbia. He thought that was a violation of the Establishment Clause. So it's a very, very broad concept. And the idea is that we want to treat everybody's views equally. We have basically religion, which is all that stuff that has to do with opinions about supreme beings, including atheism. And we have other stuff that has nothing to do with religion. And the First Amendment separates those out. So geology and French literature and all that stuff is over there. And then here we have religion in the First Amendment. And then within that realm of religion, it gets confusing because then the Supreme Court sometimes talks about religion and non-religion. But both of those are in that big realm of religion. And both of those need to have equal respect. And that's the problem. We're not being respected equally. Mr. Newgar, what was the last Supreme Court case where they stated that the First Amendment was intended to do what you just said, to differentiate, not only prevent the government from establishing a particular religion, but supporting religion as a whole as opposed to non-religion? I think McCreary County. The quote exactly was the touchstone for our analysis. They're saying this is the first thing you should look at. The touchstone for our analysis is the principle that the First Amendment mandates neutrality between religion and religion. So within that realm, religion and religion, and religion and non-religion, they're talking about those that believe in God and those that don't believe in God. And is it your position then that any reference, following up on what Judge Nelson just asked you, any reference by the government to God, a God, the God, God, is a violation of that neutrality, should not be done at all? Absolutely not. And that was how they've tried to depict this. There's absolutely no way.  It's there, right? It's kind of hard to take them out. It's going to be very difficult. And clearly the original framers believed in God. There's no question about that. But the framers were also white. They also were men. They also were property owners. We didn't make a constitution just for those individuals. We made it for everyone. And they explicitly stated that over and over. This is a constitution for all of us, including people who don't believe in God. That was an objection. Some people said Tom Amos singled her. He said, well, we'll get an atheist or a papist. They couldn't stand Catholics either at that time. They said, we'll get one of those in office. They said, no, you can't do that. We want everybody to have an opportunity and to be treated equally. If there's a reference to God, we don't want hostility toward religion. I don't want hostility to God. As I say, I want to emulate what Christian and other churches do. I want to be able to help other people and get together, but I want to be able to do it as atheists. And the government of the United States sends a message constantly that you can't do it as atheists. When they say, in God we trust, they're simultaneously saying atheists are wrong. You can't have in God we trust and have any credence. By the way, let me ask you on that a slightly different question that goes to your standing on your claim to eliminate the motto of the United States. What is your particularized injury, as opposed to that of anybody else who might share your beliefs, that causes you to have standing as to the motto claim? Well, the motto claim is sort of intertwined with the money claim. Okay, but I would answer. But they're different counts, are they not? They are different counts. You could win on the money claim and lose on the motto claim, could you not? Absolutely, and I agree. It's much more difficult. So let's concentrate on the motto claim. How would your standing argument is on the motto claim? The problem is that what the government will say is on our money, all we're doing is replacing our motto on the money. And the fact is the motto is a purely religious claim. Just to answer his question, standing on the motto claim. If there were just a motto and it wasn't used on the coins, I think I'd have difficulty with standing on the motto claim. Thank you. However, I would argue that this Court did a very good analysis, and the Ninth Circuit did in the Vasquez case. It went very clearly through standing, and it says when you are turned into an outsider, essentially, when you are stigmatized, as the Supreme Court discussed in Allen v. Wright, and it affects you personally, then you have standing. The question is, could I argue that the motto somehow affects me standing personally outside of the coins, and I don't think I can. Okay. Pardon me for interrupting you. Please proceed. I'm sorry. All right, so basically what do we have here today? We have a bunch of excuses to violate that principle that the Supreme Court has told you over and over you can't violate, the principle of neutrality, 30 separate majority opinions. And you don't have to use that test if you don't want. You can use any of their tests. You can use the Lemon test, which this Court has reaffirmed multiple times recently. Lemon says you can't do it for a religious purpose. You have in your complaint a listing from, I think, 55 to 138. Every single time when somebody was talking about this stuff in terms of putting in God we trust on our coins and our currency especially, but also as the motto, they said this was to do one thing, to espouse this purely religious view that God exists. And they said it half the time with saying that we really don't want to, we want to exclude atheists. All right. Louis Charles Rabeau, the chief sponsor of Under God in the Pledge of Allegiance, he put into the congressional record that an atheistic American is a contradiction in terms. I mean, how much more offensive could you get than that? Could you imagine what the response would be if he had said a Jewish American is a contradiction in terms, a Catholic American is a contradiction in terms? We'd go crazy. But we've come to accept that if you can do that to atheists, that's fine because we get this constantly. And I think that's a problem. And this isn't a motto. This isn't just a statement like an acknowledgement. This is a profession of faith. In God we trust. And we're supposed to take the words for what they mean. The excuses they use is that this is ceremonial. It doesn't really mean much. I will acknowledge that most people, when they pass the money, don't think about it. But I think the time to look at it is what would happen if we tried to take that off? If you rule, as I think appropriately, that the equal protection component of the Establishment Clause really means what it says, there's going to be a huge outcry. We know that. And that shows that this is not just something ceremonial. This is something that has deep meaning to everybody. And the Supreme Court has said as much. Four of the justices have said, this stuff, when we talk about God on the motto, that is religious and it has significant meaning. Mr. Nodal, you contend that the slogan, in God we trust, is a burden on your exercise of your religion. Correct. If that were not a religious phrase, but you objected to the phrase for some reason that you found it inconsistent with your religion. Suppose, for example, you found the picture of George Washington on the dollar bill or any bill offensive because under your religion you couldn't have graven images or pictures of people. Are you contending in this case that whether or not it's a religious phrase, it's a burden on your religion? I think, Your Honor, that if you look at RFRA as written, you could take it to that extreme. But I don't think anyone would take it to that extreme. All right. So your position, then, is dependent on in God we trust being a religious phrase. And clearly it is and clearly it was. You can look through the history when the first person who put this on, the director of the Mint, James Pollock, as he's deciding what to put on the coins when this was first raised. I'm just trying to see what the issue is. I'm not asking really on the merits of whether it is a religious phrase. But your position is that solely because it is a religious phrase, is it a burden on you? I think that it could still be a burden on me even if it weren't intended to be a burden. But you're not arguing that. I'm not arguing that here. Here it was clearly meant to be religious and it was clearly meant to say the message that atheists are not as good as people who believe in God. There's no question that that's what they had intended. Following up on Judge Reinhart's question, if that's your position, I'm glad you've made that clear. Aren't we barred from revisiting the issue under the Aronau case? I don't think so, Your Honor, for a number of reasons. This Court has said in Miller v. Ammi. Let's put the Aronau case in perspective. Okay. That was an appeal from Judge Burke's dismissal of a complaint seeking a three-judge court on the grounds that In God We Trust was a violation of the Establishment Clause. And this tribunal, the Ninth Circuit, found that Judge Burke's dismissal of the complaint was justified because the claim that In God We Trust was a violation of the Establishment Clause was so insubstantial that no three-judge court should be convened and sustain that. And that's been the law since 1970 in this circuit. As you know, we have a rule that a three-judge panel cannot overrule another three-judge panel unless there's been an intervening, well, there's no unless. Only an unbanked panel can do that or the Supreme Court, if we have a Supreme Court case telling us that the first decision was wrong. Now, how do we get around that? I think it's rather easy to get around that. First of all, the plaintiff in that case was deemed to not have standing. And under FWPBS, which is subsequent law, right, you had no jurisdiction. You're saying Mr. Aronow had no standing? Exactly. The district court specifically stated that Mr. Aronow did not have standing. They came to that conclusion. The circuit court said, well, even if he doesn't have standing, we're not going to decide we're going to decide anyhow it's so insubstantial. And so that plaintiff didn't have standing, Article III standing. In about a half hour, you're going to be hearing that somebody who had Article III standing but didn't have prudential standing, we should disregard that precedent. Here was a plaintiff who didn't have Article III standing. Additionally, you're allowed to disregard things that are erroneous, clearly erroneous under Arizona v. California. It is clearly erroneous. The court in Aronow didn't say, the court of appeals didn't say that the plaintiff lacked standing. It said the district court said he didn't have standing. And the court of appeals said we do not reach the question of standing. And whether that's proper or not, not to reach standing, in those days, they thought that wasn't the most important thing in the world, that the merits counted. But Except I would argue that under FWPBS, we now have new law that says subsequent intervening higher law that says you were under an obligation to do that. And think about how unfair that would be. All right. If we have subsequent intervening higher law on what? On the standing issue? On both issues. One on the standing issue, that that individual didn't have standing and you were under an obligation to make sure There's nothing we can do about that. It's like what the founders said about God. We can't rewrite this history. The court in 1970 said we're not going to reach the issue of standing and we'll decide it on the merits. So they did decide it on the merits. Well, again, they did decide it, but they didn't have a plaintiff who had adequate standing. And the court Well, they may or may not. We don't really know. The district judge said he didn't have adequate standing. Well, even if we don't go with the standing rule, I would argue that the subsequent law, right, since 1970, on 30 separate occasions, the Supreme Court has said that you need to be neutral. And you can't possibly say that you're being neutral between in God we trust and people who believe in God and people who don't believe in God in saying that we're in God we trust. Is there a subsequent to 1970 Supreme Court case which has considered the constitutionality of in God we trust either as a motto or as something printed on our currency or coins? No, there isn't, Your Honor. Then what subsequent law, you're arguing that by analogy I'm arguing that the principle that the Supreme Court has said, all of the tests that the Supreme Court has come up with since 1970, the neutrality test, the lemon test, the endorsement test, the outsider test, the imprimatur test, the coercion test, all of those tests are violated here. And if you have, that seems to me to be intervening higher law. But, Mr. Henry Dowell, although we don't have direct Supreme Court precedent, we have dicta, which is repeated and repeated, that continues to regard the motto as constitutional ceremonial deism. And that's been repeated in many Supreme Court cases. What is your response? My response is that's dicta. No one has ever been. The Supreme Court in Baker v. Carr says we need somebody who has a personal stake in the matter and make the argument to elucidate these difficult constitutional questions. You didn't have that person. The Supreme Court has never read that brief. They don't know the facts that led to the In God We Trust. They haven't seen the survey that shows, excuse me, by a three-to-one margin that Americans think this endorses religion. They haven't seen the subsequent outcry that happened with Under God and the Pledge when that was ruled unconstitutional. They don't know any of that stuff. Plus, in almost all of those cases, for instance, in Wooley v. Maynard in Allegheny County, what that statement was was in response to a dissent. And the dissent said, wait a second, if we follow the logic of your majority opinion, we're going to have to take out Under God and the Pledge of Allegiance. That should be the message that comes to this court, that there is a majority opinion that implies that In God We Trust is illegal or unconstitutional. And the dissent says, wait a second, we don't want to do that without any briefing. And the majority says in response, well, like Justice Breyer. Mr. Muta, I forgot to stop you with six minutes. Okay. So if you stop right now, we'll give you six minutes. Okay, super. Thank you very much. Good morning. May it please the Court. I'm Lowell Sergel from the Department of Justice, representing the federal defendants. The district court correctly held that this case is controlled by this court's decision in Aronow. Mr. Newdow concedes that in that case, it's essentially identical to the claims raised in this case. In Aronow, as you have discussed, the court held that the motto statute and the inscription of the motto on coins and currency is consistent with the Establishment Clause. And so ruling, this court held that the motto is a patriotic and ceremonial in nature. It also held that the inscription of the motto on coins and currency has a permissible inspirational quality. And in holding that, it relied on the House committee report at the time that the motto was adopted and relied on that. Mr. Newdow ignores that, but I think that's the best place that you can look to find the purpose of including the motto like that and adopting it as the national motto. Counsel, if the motto has a permissible inspirational message under Aronow, isn't that inspiration religion-tainted? It's not, because the committee report explained that what was inspirational is that the motto reflected the history, the unique history of this country. The motto, the phrase, in God we trust, came from the Star-Spangled Banner, our national anthem. And what the House committee found in examining this was that that was what was inspiring people, that they could look back to the unique history of our country and find that phrase in something as central as the national anthem. And also that those words have a meaning that reflects that, as with the words under God and the pledge, that our country is one that was based on the idea that people have inalienable rights that were given them by a generic creator, an external source. And that is a unique part of our history. So that's what the words in God we trust reflect on the motto and on the coins and currency. And the Supreme Court has emphasized that in determining what the reasonable observer would view, the reasonable observer is held to be accountable and to be aware of the full history and range of context that would be involved in using those words. So the air- Does that mean it's not a religious statement? It certainly has religious content. But in reviewing these kinds of phrases, the Supreme Court has emphasized that merely because the word has some religious content does not mean, does not disempower the government from using it for permissible secular purpose. Justice O'Connor made this point in her concurring opinion in the Elk Grove case with respect to the words under God in the pledge. She conceded that there is some religious significance to it. But, again, that doesn't mean that the government can't use it for permissible secular purpose. What's the secular purpose of using in God we trust, the inspirational quality that Aronau mentioned? That's right. And, again, referring the people of the country back to the unique, one of the unique attributes of our country, again, that this is a country that was founded as the Declaration of Independence. So it should say in God we trust it, right? I'm sorry? It should say in God we trusted. That would be the historical reference. Well, the words in God we trust were taken verbatim almost from the National Anthem. And when the committee- But if it's historical, we're discussing the past. They could have changed the words if they had wanted to. But, instead, they made the reasonable, I think, decision to just adopt the words as they were with the correct tense from the National Anthem. And one can hardly blame them for just taking a phrase, lifting it as such from the anthem and making it the motto. But even a phrase in God we trusted would affirm that there is a God that we trusted. I assume so. Unless he were dead, he'd still be around. I assume Mr. Newdow would object to that as well. Yes. Mr. Newdow's argument is that Aronau is no longer controlling because it's been enfeebled by subsequent Supreme Court cases. But, instead, what you will find, as you have discussed, is that the Supreme Court, in two majority opinions, has specifically referred to the motto as being consistent with the Establishment Clause. The Court used the reference to the motto in those cases as a benchmark by which it evaluated the constitutionality of the practices that were at issue in those cases. And, thus, the approval of the motto was an important part of the Supreme Court's reasoning in those cases. Our position is that that's sufficient to make that reference, binding as a matter of precedent. And which cases do you have in mind, counsel? Lynch v. Donnelly is the first case, and County of Allegheny is the second case. All of the circuits that have addressed this question, other than this circuit, four circuits, have held that the motto is constitutional. So, to disagree with the district court in this case, you would have to go into conflict with those other courts. Are you claiming Mr. Newdow doesn't have standing? We are. What do you do with our recent Vasquez case, which requires us to construe frequent, regular contact with an allegedly offensive religious symbol as a concrete injury, in fact, for Article III standing? In Vasquez, this court was careful to explain the plaintiff in that case lived in the community where the cross was used in the seal. Hence, his standing was particularized to him and wouldn't be shared by a person who lived across the country or in some other area. Who didn't come into contact with it. But you can't say that Mr. Newdow doesn't come into contact with dollar bills. He certainly does. But, again, the Supreme Court has held many times that injury must be particularized. It can't be what the court calls a generalized grievance. Well, the only difference in Vasquez, you say, is it's particularized to everybody who lives in that community. The difference you're saying is that because everyone in that community comes in contact with the cross, they have standing, but people in other communities don't come into contact with that cross. Is that the difference? That's the best way to reconcile that case with what the Supreme Court held in the Valley Forge case. Valley Forge involved a gift of federal property to a private religious institution. The plaintiff in that case alleged that he became aware of the gift by reading a news release. And the Supreme Court held that kind of injury was not sufficient to give him particularized Article III standing or prudential standing because that kind of injury could be shared by virtually any American. Any American could pull out a news release and read it. And that's what's going on here. Virtually all Americans. This is somewhat more tangible than pulling out a news release. This is something that affects Mr. Newdow every moment of his life, affects him directly. It's, I think, in fact, not as tangible because here his objection to it is a purely philosophical one, and it's one that the law does not recognize. Well, according to his complaint, it's a purely religious one. Well, again, the Supreme Court has addressed this exact claim in Woolley v. Maynard. In Woolley, the Supreme Court said that the government couldn't require somebody to put live, free, or die on their license plate, but it distinguished in that it was careful to distinguish in a footnote. Well, it didn't have this issue before it. Whatever it may have said in the footnote, it couldn't have ruled on this issue when it was ruling on the issue of a New Hampshire license plate. The court took pains in the case to distinguish. It put something in the case. We don't know to what extent it agonized over it. I'll grant you that. Again, I think this leads me, I think, back to our main point, which is the difference between our case and Mr. Newdow's case and our reading of precedent. His view of what's on point is pulling generalized statements from cases that are out of context and are stated at a very high abstract level and alleging that they control and are on point in a completely different context. Our view is that when the Supreme Court specifically makes a statement about the issue that's before the court now and considers it and makes it an important part of the reasoning in that case, that is the kind of ruling to which you should defer. Well, the best solution might be, then, if we gave the Supreme Court a good opportunity to resolve this question so that you wouldn't have to argue your dictum and he wouldn't have to argue the things you claim he pulls out of things. Well, I think either way you decide this case, the Supreme Court will have a chance. I'm sure if we win, Mr. Newdow... I said a good chance. I think if we agree with Mr. Newdow, they'd have a good chance. If we agree with you, they might not, well, might not take it. Well, I think that's up to the Supreme Court, and this Court shouldn't try to predict what they would do or what they would view as the best vehicle to take a case. If they want to take a case, they'll take it, I think is the answer to that. Well, I just thought you might like to give them the opportunity to consider this issue. I think we prefer to win the case here. Let me go back to your statement that there is religious content to this motto, and Mr. Newdow's claim that the religious content makes him engage in conduct that's inconsistent with his religious principles. Do you disagree with that? Yes. That's a nice softball for you, isn't it? Well, thank you very much. We'll take whatever we can get on two grounds. First of all, the district court reviewed this argument and said that even though there's some religious content, what the reasonable observer would find in looking at this language is that it's a permissible acknowledgment of religion. Now, that should be enough, I think, to take care of his RFRA claim as well, because if something is an acknowledgment of religion reviewed by the reasonable observer, that should be enough to, I think, also defeat RFRA. Well, why is it the reasonable observer, if some religious group were to take the position that some action interferes with their religious beliefs, their religious beliefs don't have to be reasonable, do they? No, but the Supreme Court also has explained that a person can't just say that the moon is made of green cheese and state a RFRA claim, nor can they take a position that's just legally incorrect and rely on that. Now, that's the Tony and Susan Alamo case, which is cited in our brief. If a person can't rely on a statement that's just legally incorrect as providing the basis for a RFRA claim. But there's a second answer, too. Well, what's legally incorrect? Your statement that this motto has some religious content and Mr. Newdow's statement that in his religion, that content imposes a substantial burden on him because it's contrary to his religion to use money with that motto on it. What's wrong with that position? Well, the answer is the Woolley case. The Supreme Court, again, looked at this specifically in the Woolley case and said that money is passed from hand to hand all the time and that merely using money to pay for something does not require a person to endorse any of the language that is on the money. And that's the genesis of his RFRA claim. He's saying that he feels compelled. It doesn't endorse a person to, but in his religion's view, and we're on a motion to dismiss, assuming that this is a religion, assuming it's good faith, assuming it's sincere, and assuming that under that religion it's offensive and they won't pass that kind of money because of the religious content. What's wrong with that? I think you have to look to the genesis of his claim. The nut of his claim is that he can't use the money because using the money requires him to endorse the words on the coin. And the Supreme Court in Woolley specifically said that is not the case. Merely using the money does not force anybody to. I'm sorry. No, the Supreme Court wasn't saying that in the context of what a religion views that statement as requiring. They were saying that, you know, to the average run-of-the-mill citizen, it doesn't require an endorsement. They weren't assuming that they were saying anything other than pure dictum. But just taking the statement on its face, they weren't saying that in the light of a claim that our religion prevents us from doing that. And under our religion, that's the view of it. With all respect, I think that what they said is broad enough and makes enough sense that it does cover this case. They didn't distinguish out, for example, that this wouldn't apply in a free exercise case as opposed to an establishment case. They made a broad statement that I think covers the nature of his claim. The government has a compelling interest anyway, as we've explained in our brief, even if he can state a substantial burden. What's the compelling interest in putting a particular slogan on money? Well, as Justice O'Connor explained in her Elk Grove opinion, these kinds of statements sustain the nation even today. For example, Mr. Nitto, I assume, would not want us to sing God Bless America or the National Anthem because they have the word God in them. But as Justice O'Connor pointed out, these are important things to the nation, especially in this time, and they shouldn't be taken from the country. I think the words in God Bless America have an inspirational quality, as this Court stated in the Arenow case, and that should be a sufficient interest to be a compelling interest. But doesn't Arenow discredit the validity of Newdow's beliefs? Not at all, because, again, this is his mistake, too. He claims that the legislative history of the In God We Trust showed that Congress was meaning to denigrate atheists, but there's nothing of that at all in the committee reports, for example. The committee reports say nothing about atheists. What they say is that Congress was wanting to adopt these words because they were in the National Anthem. They seemed like good words. They have been universally accepted. As far as it could tell, it would be good words for a motto, and that was it. So they weren't intending to denigrate anybody, and because the reasonable observer does view them that way, then they're not a denigration of anybody. I'm far over my time, but I would be happy to answer more questions. How much were you sharing your time? Yes, Mr. Snyder from The Intervener also has time this morning. He's got four minutes, 34 seconds. He was supposed to have eight. Well, we'll bargain with him. Thank you, Your Honor. Okay. May it please the Court, one of the primary issues before this Court is whether an acknowledgment of religion is the equivalent to an establishment of religion. Establishment of a religion involves sponsorship, financial support, active involvement by the sovereign in religious affairs, whereas acknowledgment is minimal, historical, ceremonial, generally nonsectarian. The motto falls within the category of an acknowledgment of religion. Our national motto, In God We Trust, is consistent with the presuppositions, the political presuppositions of our country, that people are created by God and they are given certain rights. Fundamental rights cannot be removed at the discretion of the government. When the government removes those rights, it is acting illegitimately. In God We Trust is reflective of that history, and as such the national motto is not an establishment of religion. There is an issue that has been raised relative to neutrality, and does religion, can government do anything which supports one religion or all religions? Now, taking that particular position would be inappropriate and work a draconian effect on cases involving solemnizing acknowledgments of religion. Sometimes the Supreme Court refers to these inartfully as ceremonial deism or tolerable references to religion, to de minimis acknowledgments of religion. But if government were to remove all emblems of our religious heritage from civic life, such a purge would work an unconstitutional hostility towards religion. Mr. Schneider, in every jury case, when a witness takes a stand, he's asked to either swear or affirm to tell the truth. It doesn't seem to bother the taking of evidence. So he doesn't have to swear that he's going to tell the truth, so help me God, he can just say, I affirm to tell the truth. That doesn't really eliminate our system of trial, does it? It does not. So isn't your statement a little bit broad, that the removal of God from everything would cause the republic to tremble? Well, Justice Kennedy has said that such removal would cross the line and work an unconstitutional hostility towards religion. As one court has opined, atheism would become the default religion under the Establishment Clause. Religious acknowledgments by the government, if they're ceremonial, minimal, and particularly if they have some sort of history or are pedagogical or trying to teach something, are perfectly appropriate under the Establishment Clause. The national motto is not sectarian. You know, we survived, I think, until 1950-something, for a couple of hundred years without having that motto or having it on our bills. And you think the nation would really be seriously wounded if we didn't have that motto on our bills? The answer is the nation would not be wounded, but if the courts were to develop a draconian view of strict neutrality on religion so that a principle was such that there can be no government acknowledgment of our religious heritage, that would wound the nation. That would be inappropriate. Well, historical acknowledgment is certainly no one suggesting we can't acknowledge the history of the country. But what you put on a dollar bill doesn't really seem to me to be that the government has any compelling interest. If it put Ronald Reagan's picture on the dollar bill and said, what a wonderful president, we'd survive that. It might not be accurate, but does it really matter? Does it really have a compelling interest as to what slogan they put on the dollar bill? The court's point about a compelling interest is perhaps a little bit off point because the ‑‑ Well, I didn't raise that point. The government did, but so tell them it's off point. Okay. Well, compelling interest, what would be the harm is that the government's ability to acknowledge the political presupposition of our republic would be off the table. We would no longer be able to do that. That would cause a harm to our country because government cannot take away fundamental rights. Fundamental rights, inalienable rights are not at the discretion of the government. The motto in essence is a concession by the government that should it violate inalienable rights, it is illegitimate. That's why we have the Declaration of Independence. The motto simply reflects that, and that is not an establishment of religion. All right. Well, let's hope we don't have to reach the compelling interest issue. Now, as our position in our briefs is that we believe that the legal framework for analyzing the motto is not lemon. The courts have looked to a discrete set of cases in which there is the presence of religion and yet an absence of an establishment of religion. Marsh, again, they often refer to these as ceremonial deism. Marsh v. Chambers is a good example of that framework where we have legislative prayers and we have a chaplaincy. An atheistic senator challenged that, and the Eighth Circuit, using lemon, found those practices to be constitutionally wanting. The U.S. Supreme Court, though acknowledging that lemon was used, it declined, and by the lower court, declined to follow lemon. Instead, it found history, it found ceremony, and arguably it found a lack of sectarianism, and as such it refused to skewer the chaplaincy and the prayers with lemon's three prongs. In that respect, we believe that this court does not have to be bound by lemon. The question isn't, is lemon good law? Lemon is good law, but it is not the exclusive law for analyzing an Establishment Clause case. That is our position on that. Now, as far as sectarianism, Dr. Newdow has argued that the motto is, in fact, sectarian. We believe that that, as a matter of language, is incorrect. It is self-evident that the concept of God is infinite. Monotheism is held by billions of people. It's a theological belief held by billions of people in six or seven different religions. It is not of the spiritual partisanship that marks sectarianism. If the word is, in the Christian God we trust, I would assume that you would agree that that would not be appropriate? That would not be appropriate because it is not reflective of the originating documents. The Virginia Bill of Rights, which the First Amendment was taken from, they had at first put in reference to Christ, and that was stricken. And they wanted it to be a little broader. And we think that Congress has been careful to not be sectarian in this matter. And so it is our view that the motto is not sectarian, and thus it should not be ruled as a violation of the Establishment Clause. I'm not certain what my time is on that. Can you distinguish the use of God here from what Rabbi Gutterman used in the Lee v. Weissman case in his benediction or invocation when he just talked about God of the free, hope of the brave and talked about the legacy of America and never again mentioned God in the invocation, but Justice Kennedy ruled for a majority that that kind of reference was coercive religion? That was in the context of a graduation ceremony. And in that context, it was unique factually in that you have students who are, this is a milestone in their life, were they attending a graduation ceremony. In essence, the motto is a ubiquitous piece of an item which we use for commerce, carried on our person. And so one does not adopt as their own what they carry on their person. And so that's how one would distinguish that case. The rabbi's reference was to Micah, was it not? It was with reference to a specific religion. Isn't that correct? I believe so, unless it's different than what Judge Reinhart just mentioned. Yes, the issue is if it is sectarian, then it would probably not pass the Establishment Clause test. My time has expired unless there's further questions. Thank you. This is always the hardest part for me because there's so many things to address. Let me first start by the binding precedent on Aronow. Aronow said the motto has no theological impact. That, it seems to me, is clearly wrong. And under Arizona v. California, if something is clearly erroneous, it doesn't have precedential value. The President of the United States says that the words of the motto… Pardon me, sir. It may not have any precedential value to the United States Supreme Court, but here in the Ninth Circuit, we are bound to follow what other Ninth Circuit decisions have held, no matter how erroneous we think they are until the end bank court overrules it. My reading of the Supreme Court case in Arizona was that if, in fact, something is clearly erroneous and will work a manifest injustice was what they said. You may be right in the Supreme Court, but I don't think you're right with respect to the Ninth Circuit. Okay. Well, I will try another. In Wooley v. Maynard, they discussed the actual quote was, the state's interest to disseminate an ideology cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message. That was what they responded to and said, well, wait a second. If that's true, then we have problems with In God We Trust on the coins. With no briefing, Chief Justice Berger, I think, who wrote the opinion, was trying to gather a consensus. And so he said back, well, that's different. The coins you carry on your person and nobody knows about it. That's all he said. And the fact is that, yes, the coins you carry on your person, I have on my body, not right now, but when I have to use it, I have this message that says, In God We Trust. And I don't mean to get into theology, but let me just mention that the God that they're talking about is the God of the Bible. That Bible says, in Psalms 14.1, the fool hath said there is a God. They are corrupt. They have done abominable works. There are none that doeth good. That is the word of this God I supposedly am having trust in. And it further says, How do you know which God? Because we can look at the history. We know what James Pollock put on the coins when he was director of the Mint. He said, We claim to be a Christian nation. Our national coinage should declare our trust in God, in Him who is King of kings and Lord of lords. I think we know who that was. And everybody has said that since. They've referenced this as a Christian God in the deliberations of Congress subsequently in the 1950s. They mentioned Christianity multiple times. We know which God this is. I don't think there's any question. You ask people, what's America? They say we're a Christian nation by 60%. We know which God this was. And I am certainly allowed to interpret it that way with such a strong history. And the President of the United States, when he talks about last year, when he's talking about the 50th anniversary of the motto, he said, The words in God we trust recognize the blessings of the Creator, not a creator. We know which one. And so we offer our thanks for His, capital H, great gift of liberty. I think we know which God that is. And let me just finish with Leviticus in 2416, whoever blasphemes the name of the Lord, he shall surely be put to death. I don't think I should really be required to carry around somebody who wants to kill me or that I trust in such a person. The other issues are that the history and tradition that we keep hearing about. If I might just give an example for one second. Just this year, the House passed House Resolution 431, which looked back at the history and tradition of anti-miscegenation statutes. And it said, Well, let's look. In Maryland in 1661, we started it. The Supreme Court upheld it. In 1883 in Pace v. Alabama, in 1948, 38 of the 48 states, almost 80 percent had anti-miscegenation statutes. That was our tradition. That was our heritage. And what the Supreme Court did in Loving v. Virginia, unanimously said was, We don't care about that history because it's subversive of the principle of equality. If this case isn't subversive of the principle of equality, I don't know what is. The government of the United States says, as its national motto, the guiding principle of our nation, we are going to take this one purely religious view and put that on our coins and currency. And those of you who don't agree are wrong because you can't say that God doesn't exist if we the government say, In God we trust. Clearly, that's subversive of the principle of equality. There's a million other things they mentioned. The Star Spangled Banner, that was not the initiating event. That was what they found subsequently. Somebody read through this and on the fourth standard they said, Oh yeah, and this be our motto in God is our trust. Let's use that to justify this after the Supreme Court told us that they couldn't do it for religious purposes. So they said, Okay, we'll call that historic. Singing God Bless America. I have no problems with people singing God Bless America. What I have a problem with is if the government of the United States says, Let's make God Bless America our national anthem because it says, God Bless America. That's different. That's a governmental endorsement of religion. And as the Supreme Court has also said, there's a crucial difference between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion. So you would also, maybe not in this lawsuit, move to strike the references in the national anthem to the Creator? Not at all. The reference, that would be hostility toward religion. In the national anthem, in the fourth stanza, which nobody knows about, they have this one thing that talks about God. I wouldn't strike it just because there's some God stuff in there. If, on the other hand, the Congress said, Let's move the fourth stanza to the first stanza and have everybody sing that because that's what we really want to talk about, God, then I would have a problem with it. The question is, what's government's intent? I don't want hostility toward religion at all. I want God in the public square. I want to hear that discussion. I may change my mind. You just don't want government telling people to say God. Exactly. That's all it is. And the government says, this isn't a reference to God. It says, In God We Trust. That's an active statement now. And I think you're absolutely correct, Judge Reinhart. They could have said, In God We Trust, if that's what they meant. And nobody made that claim until after the Supreme Court said, If you admit the truth, we're going to have to undo In God We Trust. Basically, I can conclude now. Let me just make two other things. One is that just last week, and this is just to show how this actually affects me, and this is real, last week on the 28th of November, the Department of Education and the Office of Faith-Based and Community Initiatives had a workshop in Portland, Oregon. I definitely wanted to go. We in our church, and it's a real church. I know it sounds loony and everything else. It's real. We want to do the things that other people do, that help other people. We recognize that we are fortunate and we can help other people. And there was a thing that all of us thought was great. There was this program, this workshop in Portland that had a means to get funding to do teaching of the disadvantaged in terms of language and math, language arts and math. I definitely wanted to go. I refused to go. There's no way, even if I use credit cards, I have to tip somebody. I have to use a vending machine. I have to do parking. I'm not going to do this to act for my church to go and say I trust in this being. I'm not going to do that. And that's a perfect example. That's just one of many. This is clearly a substantial burden. Government has no compelling interest. And if it had a compelling interest, this is certainly not the most narrow means of dealing with it. So even if we say that Aronow is good law and the Establishment Clause claim fails, the RFRA claim obviously is valid and I hope this court will uphold that. I just want to say basically this is, again, repeat in loving Virginia, this is subversive of equality. I'm asking merely that the government treat every American equally on the basis of their religious beliefs. Atheists have been disenfranchised for long enough. I'm on national TV. Oliver North takes out a dollar bill. Look, in God we trust. That's what we stand for. And he wasn't alone. That's a representation, I think, of the majority of Americans. You have data that shows it in the complaint. And what are they asking for? They're asking, I mean, we have the Department of Justice arguing, please, come on, allow us to favor one particular religious belief. I can't believe I'm hearing that from the Department of Justice of the United States, which the President of the United States is the beacon of religious freedom. This is not religious freedom. Thank you, Mr. Mugabe. Thank you. Case just argued will be submitted.
judges: Nelson, Reinhardt, Bea